49 P.3d 117 (2002)
146 Wash.2d 608
Donald R. FIRTH and Barbara A. Palecek, husband and wife, Petitioners,
v.
Hefu LU and Qian Sun, husband and wife, Respondents.
No. 70702-2.
Supreme Court of Washington, En Banc.
Argued November 8, 2001.
Decided June 27, 2002.
Law Offices of J. Richard Aramburu, Jeffrey Eustis, Seattle, for Petitioners.
Edwards, Sieh, Smith & Goodfriend, Howard Goodfriend, Seattle, Kenton Longley, Kenmore, for Respondents.
J. Anthony Hoare, Seattle, Amicus Curiae on Behalf of Maryland Apartments, Inc.
SANDERS, J.
We here consider whether an agreement to transfer shares in a corporation that operates a housing cooperative is subject to the real estate statute of frauds, RCW 64.04.010. We hold that it is not because stock in a *118 cooperative corporation is not an interest in real property transferable by deed.

FACTS
In 1977 Donald Firth and Barbara Palecek moved into the Maryland Apartments, a housing cooperative on Seattle's Capitol Hill. The housing cooperative was organized in 1948 by the filing articles of incorporation for the Maryland Apts. Inc., the corporation that owns the land and building commonly referred to as the Maryland Apartments. The building contains 19 apartment units, each associated with a separate block of shares in the corporation. These cooperative units are rented out by the corporation to its shareholders under long-term proprietary leases. One may become a resident of the Maryland Apartments only by acquiring the block of shares associated with a particular uniti.e., by becoming a shareholder of the corporation Maryland Apartments, Inc.[1]
A key component of any cooperative housing is the ability of its management to exercise control over who may become a member and resident. In the case of the Maryland Apartments, the board of directors of the corporation exercises this control by virtue of the corporate bylaws, which restricts shareholders' ability to transfer their shares. A shareholder may transfer his or her stock only upon the approval of the board of directors. If the board approves the proposed transfer, the departing shareholder surrenders his or her share certificate to the corporation, which issues a new certificate to the entering shareholder. Only after the proposed stock transfer has been, approved is the entering shareholder entitled to a proprietary lease for the apartment unit to which the shareholder's block of shares is associated.
Donald Firth has had paralysis of the legs since being struck with polio at the age of two. He and his wife Barbara Palecek (the Firths) therefore moved into apartment 3, one of the ground-floor units at the Maryland Apartments. In 1994, Hefu Lu and Qian Sun (the Lus) moved into the other ground-floor unit, apartment 2. Some two years later Lu approached Palecek to ask if she and her husband were interested in buying his and Sun's interest in apartment 2 for $165,000. The Firths were interested because apartment 2 was the bigger of the two ground-floor units, but Lu left the country on business before a written agreement could be prepared. Negotiations continued while Lu was in Europe, with Lu's business partner John Swaner acting as an intermediary.
The parties eventually settled on the purchase price of $180,000, at which point Swaner and the Firths drew up the following agreement:
April 18, 1997
Barbara A. Palecek and Donald R. Firth agree to purchase Apartment 2 (626 13th Avenue East) from Hefu (Max) Lu and Qian (Jeanette) Sun for $180,000. Possession to take place on October 15, 1997 after exchange of remainder of purchase price and receipt of stock certificate.
Enclosed are checks for $500 given in earnest.
Clerk's Papers (CP) at 153. The Firths signed the agreement the day it was drafted and provided Swaner with deposit checks for the Lus in the amount of $500. The Lus signed on the 23rd of April when Swaner met up with them in Europe, but only after the Firths agreed to provide an additional $1,500 in deposit.
When the Lus returned from Europe in September 1997 Sun was reluctant to sell at the agreed-on price of $180,000. She wanted an additional $50,000 and convinced her husband to approach the Firths to request an extension of the date on which the Firths were to take possession of apartment 2. Unaware of Sun's reluctance to go through with the deal, the Firths agreed in early October to extend the date one month to November 15, 1997, and again in early November to extend the date to the end of December. In early January 1998, Lu informed the Firths of his wife's dissatisfaction with the purchase *119 price and that she wanted to raise it to $230,000.
The new price was unacceptable to the Firths, who initially attempted to resolve the matter out of court. When those attempts fell through the Firths commenced the instant action to obtain an order compelling the Lus to specifically perform the agreement and transfer the block of shares associated with apartment 2 to the Firths. The Lus moved to dismiss for failure to state a claim upon which relief can be granted, arguing the agreement did not comply with the real estate statute of frauds and was therefore unenforceable. The Lus' motion was denied, after which the Firths filed their own motion for summary judgment. In opposition the Lus again argued the agreement was unenforceable for failure to comply with the statute of frauds. They also claimed the contract was unenforceable because it lacked essential material terms and the Firths were allegedly unable to perform. The trial court granted the Firths' motion for summary judgment and directed the Lus to specifically perform the agreement by transferring to the Firths the shares associated with apartment 2 upon the Firths' tender of the $180,000 purchase price.
The Lus deposited the purchase money into a blocked trust account[2] and appealed. The Court of Appeals reversed, concluding the contract lacked a legal description of apartment 2 and was therefore unenforceable under the real estate statute of frauds, RCW 64.04.010. Firth v. Lu, 103 Wash.App. 267, 268, 12 P.3d 618 (2000). The Court of Appeals did not address the Lus' arguments the contract was unenforceable because it lacked essential material terms or that the Firths were allegedly unable to perform. The Firths then petitioned this court to review the applicability of the statute of frauds to this contract. We granted review and reverse, remanding to the Court of Appeals for further proceedings pursuant to RAP 13.7(b).[3]

DISCUSSION
We review a summary judgment, making the same inquiry as did the trial court. Kruse v. Hemp, 121 Wash.2d 715, 722, 853 P.2d 1373 (1993). Summary judgment is proper only when pleadings, depositions, admissions, and affidavits show there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. CR 56(c); Barrie v. Hosts of Am., Inc., 94 Wash.2d 640, 642, 618 P.2d 96 (1980). The applicability of the statute of frauds to this transaction is a question of law.

I.
The real estate statute of frauds provides in part:
Every conveyance of real estate, or any interest therein, and every contract creating or evidencing any encumbrance upon real estate, shall be by deed....
RCW 64.04.010. Although the general statute of frauds, RCW 19.36.010, differs from the real estate statute of frauds, the two share common theoretical underpinnings. For example, the main purpose of both statutes is to prevent fraud in contractual undertakings. Miller v. McCamish, 78 Wash.2d 821, 828, 479 P.2d 919 (1971). We previously said RCW 19.36.010 must be narrowly construed to achieve its purpose to prevent fraud or avoidance of otherwise enforceable agreements. See Bell v. Hegewald, 95 Wash.2d 686, 691, 628 P.2d 1305 (1981) (citing Chambers v. Kirkpatrick, 145 Wash. 277, 280, 259 P. 878 (1927)). Since RCW 64.04.010 shares the same purpose it too must be narrowly construed and not applied to agreements that are not "strictly within its terms." Chambers, 145 Wash. at 280, 259 P. 878.
*120 By its plain language RCW 64.04.010 applies only to the following agreements: (1) actual conveyances of title or interests in real property; and (2) agreements that create or evidence an encumbrance of real property. If an agreement falls into either of these categories, it is enforceable only if executed in the form of a deed. RCW 64.04.010, .020; State ex rel. Wirt v. Superior Court, 10 Wash.2d 362, 366, 116 P.2d 752 (1941). Conversely, if an agreement does not fall within any of these three categories, RCW 64.04.010 does not apply and the agreement may be enforced even if not executed by a deed.
This agreement is for the purchase of apartment 2 in the Maryland Apartments by exchange of cash for stock. Title to the land on which that cooperative unit is located is held by the Maryland Apartments, Inc., and is not affected per se. A grantor of property can convey no greater title or interest than the grantor has in the property. Sofie v. Kane, 32 Wash.App. 889, 895, 650 P.2d 1124 (1982). The agreement between the Lus and the Firths therefore does not convey real property.
Nor does the agreement create or evidence an encumbrance of real property. An agreement to lease property for more than one year is within the real estate statute of frauds because long-term leases encumber real property. Family Med. Bldg., Inc. v. Dep't of Soc. & Health Servs., 104 Wash.2d 105, 108, 702 P.2d 459 (1985); Tibbals v. Iffland, 10 Wash. 451, 455, 39 P. 102 (1895). But cf. Presten v. Sailer, 225 N.J.Super. 178, 542 A.2d 7, 12 (1988) (indicating a proprietary lease grants an interest in real property). But this agreement was neither one to lease property for more than one year nor was it an agreement to transfer a long-term proprietary lease. Although the Lus did hold a long-term proprietary lease for apartment 2, they had no right or ability to transfer that lease to the Firths.[4] Their lease was expressly tied to the block of shares associated with the cooperative unit referred to as apartment 2. A shareholder-tenant in the Maryland Apartments may sublet his or her apartment, but a change in lessees can be effected only by the departing shareholder proposing to transfer his or her block of shares to an entering shareholdera transfer that is subject to approval by the board of directors. Only if the proposed stock transfer is approved will the corporation issue a new proprietary lease to the entering shareholder.
Consequently, the agreement between the Firths and the Lus would be subject to RCW 64.04.010 only if it could be considered a conveyance of an interest in real property. This would require us to view stock in a cooperative corporation as an interest in real property.
Stock in a corporation whose only asset is real property is not an interest in real property. See Bell, 95 Wash.2d at 692, 628 P.2d 1305. Stock evidences ownership in a corporation, not its realty. See id. The real estate is owned by the corporation alone. Id. Furthermore, if an agreement is not for the actual conveyance of real property or an interest therein, it does not fall under the real estate statute of frauds even if the end result is an interest in land.
For example, in Malnar v. Carlson we held the statute of frauds does not apply to an agreement to establish a partnership for the purchase and sale of real estate because "[s]uch agreements are not contracts for the sale or transfer of interests in land." 128 Wash.2d 521, 533, 910 P.2d 455 (1996). See also 25 David K. DeWolf & Keller W. Allen, Washington Practice, Contract Law and Practice § 3.3 (1998) (citing John D. Calamari &Joseph M. Perillo, Contracts § 19.14, at 794 (3d ed.1987)). Courts elsewhere have reasoned along similar lines, and have held the statute of frauds does not apply to contracts to build a building on another's land or agreements to lend money for another's acquisition of land because they are not agreements *121 to transfer an interest in real property. See, e.g., McCaffrey v. Strainer, 81 A.D.2d 977, 439 N.Y.S.2d 773, 774 (1981); Horner v. Frazier, 65 Md. 1, 4 A. 133, 136 (1886). Thus, even if we were to construe the agreement between the Firths and the Lus as one that results in an interest in or encumbrance on real propertyin the form of the Firths being issued a proprietary lease for apartment 2 upon approval of the proposed stock transferit would still not fall within the real estate statute of frauds.[5]

II.
The Court of Appeals concluded the interest transferred in an agreement to purchase a cooperative apartment unit is an interest in real property because the shares are necessarily accompanied by a proprietary lease and the shares of stock are not true securities. Firth, 103 Wash.App. at 268, 12 P.3d 618. We disagree.
The fact that ownership of stock in a cooperative corporation may entitle the shareholder to a future proprietary lease does not make such stock an interest in real property. Under Malnar an agreement which results in or is accompanied by an interest in land does not fall under the real estate statute of frauds because the agreement itself does not convey an interest in real property. 128 Wash.2d at 533, 910 P.2d 455.
The Court of Appeals emphasized case law from New York and New Jersey to support its conclusion transfer between the Lus and the Firths involved the transfer of an interest in real property. Firth, 103 Wash.App. at 273, 12 P.3d 618. Primarily the court relied on the New Jersey case Presten v. Sailer, 225 N.J.Super. 178, 542 A.2d 7 (1988). We disagree with the Court of Appeals that the Presten court's observations apply with respect to the Maryland Apartments or any other housing cooperative in the state of Washington. See Firth, 103 Wash.App. at 274, 12 P.3d 618.
To begin, the New Jersey real estate statute of frauds is very different from RCW 64.04.010. Compare RCW 64.04.010 with N.J. STAT. ANN. §§ 25:1-11, 25:1-13 (West 1997). Washington's statute of frauds is associated with additional requirements that the property in question be described "by the correct lot number(s), block number, addition, city, county, and state." Martin v. Seigel, 35 Wash.2d 223, 229, 212 P.2d 107 (1949). For the same reason, the relatively extensive body of case law on cooperative housing from New York is of little guidance to us here in Washington on the issue of whether stock in a cooperative corporation is an interest in real property. See N.Y. GEN. OBLIG. LAW § 5-703 (McKinney 2001).
More importantly, the Court of Appeals' reliance on Presten for the proposition that the transfer of any interest in a cooperative unit is a transfer of a real property interest, if that indeed is what the Presten court concluded, fails to take into account the well-settled rule that a grantor can transfer no more title or interest than the grantor has in the property. See Sofie, 32 Wash.App. at 895, 650 P.2d 1124. The grantors in this case, the Lus, did not have an interest in the real property on which apartment 2 is located. The only interests the Lus had with respect to their cooperative unit in the Maryland Apartments were a block of shares associated with apartment 2 and a proprietary lease for that apartment. Even if we were to accept the Presten court's characterization of a proprietary lease as an instrument granting an interest in real property, see Presten, 542 A.2d at 12, the Lus nevertheless had no ability to directly transfer their lease for apartment 2 to the Firths. This was an agreement to transfer stock.
*122 Presten also discussed the hybrid nature of cooperative ownership and how a shareholder-tenant generally perceives himself or herself to be a homeowner, much like the owner of a condominium. Presten, 542 A.2d at 12-13. While the common perception may be that cooperative housing and condominium associations are essentially the same, there are crucial legal distinctions between the two forms of ownership. The purchaser of a condominium acquires full title to an individual unit in the complex as well as an undivided interest in common areas such as lobbies and recreational facilities. 4 Thompson on Real Property (David A. Thomas ed., 1994) § 36.04 at 192. In contrast, occupants of a cooperative housing are merely tenants of the entity which owns the real property, typically a corporation, as well as owners of that entity. Id. at §§ 36.03 at 191-92, 36.06 at 197 & n. 44. The purchaser of a cooperative housing unit, meaning one who agrees to purchase an existing shareholder's stock in the cooperative corporation, acquires from the seller part ownership of the legal entity that owns and operates the housing cooperative. Id. The purchaser of a cooperative housing unit obtains no title or other interest in the cooperative's real property by virtue of his or her agreement with the existing shareholder.
The Lus have brought to our attention cooperative units are typically advertised for sale under the homes-for-sale section of newspapers. They also point to their agreement with the Firths and argue its wording, "Barbara A. Palecek and Donald R. Firth agree to purchase apartment 2 (626 13th Avenue East)," evidences the parties' intent to transfer an interest in real property. CP at 153. Lastly, the Lus repeatedly point to the "practical" or "economic" realities of the transfer of a cooperative unit and argue this shows their agreement was one for the transfer of a real property interest.
The Court of Appeals reasoned along the same lines when it stated the agreement between the Lus and the Firths shows "the practical reality of a sale of a cooperative unit is a transfer of an interest in real property":
The transfer of stock was incidental; the real import of the transaction, as perceived by the parties, was the transfer of the right to possess and occupy the apartment unit.
Firth, 103 Wash.App. at 274, 12 P.3d 618.
However, neither common perception, intent of the parties, nor practical or economic realities affects the legal status of this agreement. Cf. dissent at 126 (suggesting the relevant concern is the "essence" of the transaction). As a matter of law, the agreement between the Lus and Firths did not, and could not, convey realty as such or any interest in realty.
The Court of Appeals also relied on Presten's analysis of federal tax law, noting this body of law treats cooperative housing similar to ownership of a house in terms of mortgage deductions. Firth, 103 Wash.App. at 273, 12 P.3d 618. But the Court of Appeals misread Presten's tax analysis and misunderstood why the internal revenue code allows owners of cooperative housing to deduct interest payments. Contrary to the Court of Appeals assertion, federal tax law does not support the conclusion that stock in a cooperative corporation should be considered an interest in real property.
A taxpayer may deduct from his or her gross income interest paid or accrued during the taxable year on "acquisition indebtedness" or "home equity indebtedness" with respect to a "qualified residence." I.R.C. § 163(a), (h)(1)-(3). For purposes of our discussion here, this basically means a homeowner may deduct mortgage payments, within certain limits. See, e.g., I.R.C. § 163(h)(3)(B)(ii), (C)(ii). See also 3 Stand. Fed. Tax Rep. (CCH) ¶9402. This mortgage deduction under section 163 is not directly available to shareholder-tenants in a cooperative housing since they are not the owners of the real property. Instead, the interest deduction under section 163 is directly available only to the cooperative corporation, as it is the owner of the real property. But the internal revenue code allows shareholder-tenants to deduct from their gross income a proportionate share of interest deductions the corporation may claim under section 163. See I.R.C. § 216(a)(2). In other words, if a *123 shareholder-tenant in a cooperative housing finances a purchase of stock in a cooperative corporation, he or she may deduct interest payments under circumstances similar to a homeowner's deduction of mortgage payments.
A homeowner is allowed to deduct mortgage payments not because his or her home is real property, but because it is a residenceor more precisely a "qualified residence." See I.R.C. § 163(h)(4)(A). A simple example involving a taxpayer with three homes reveals this distinction. A home constitutes a "qualified residence" if it is a taxpayer's principal or second residence. I.R.C. § 163(h)(4)(A)(i); 26 C.F.R. § 1.163-10T(p)(1)(2001). Thus, even if a taxpayer has three homes only two of them will qualify for the interest deduction under I.R.C. § 163.
Similarly, a shareholder-tenant may deduct interest payments not because stock in a cooperative housing corporation is an interest in real property, but because a cooperative housing unit is considered a residence under the internal revenue code. A "residence" is generally defined to include "a house, condominium, mobile home, boat, or house trailer that contains sleeping space and toilet and cooking facilities." 26 C.F.R. § 1.163-10T(p)(3)(ii) (2001). For purposes of the interest deduction under section 163, the term residence also
includes stock in a cooperative housing corporation owned by a tenant-shareholder if the house or apartment which the tenant-stockholder is entitled to occupy by virtue of such stock is a residence within the meaning of paragraph (p)(3)(ii) of this section.
26 C.F.R. § 1.163-10T(q)(1)(2001). Thus stock in a cooperative corporation is considered a "residence" under federal tax law; it is not considered an interest in real property.
Lastly, the fact that stock in a cooperative corporation is not a true security is no reason to categorize it as an interest in real property. Again the Court of Appeals relied on Presten as support on this point, which in turn relied on United Housing Foundation, Inc. v. Forman, 421 U.S. 837, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975). See Firth, 103 Wash. App. at 273, 12 P.3d 618. The issue in United Housing Foundation was markedly different from the one we face here, and had nothing to do with the statute of frauds. The only issue before the Court was whether stock in a cooperative corporation can be considered "securities" for purposes of the Securities Act of 1933 and the Securities Exchange Act of 1934. United Hous. Found., Inc., 421 U.S. at 840, 95 S.Ct. 2051. The Court concluded such stock does not fall within the statutory definition of "securities" because it lacks the common features of securities, such as the right to receive dividends, negotiability, voting rights in proportion to the number of shares owned, and because the inducement to purchase such stock is to obtain housing, not to invest for profit. Id. at 851, 95 S.Ct. 2051. This conclusion is no basis for extending application of Washington's real estate statute of frauds to stock in cooperative corporations.

CONCLUSION
The only interest the Lus transferred by their agreement with the Firths was their stock in the Maryland Apts. Inc. Stock is not an interest in real property. Therefore the parties' agreement is not covered by RCW 64.04.010. The contract whereby the Lus agreed to sell their stock in the Maryland Apartments to the Firths for $180,000 may be enforceable even though not in the form of a deed.
The real estate statute of frauds was the sole ground for the Court of Appeals' reversal of the trial court's summary judgment in favor of the Firths, see Firth, 103 Wash.App. at 278, 12 P.3d 618, although the alternative unresolved defenses may support the same result. We therefore remand to the Court of Appeals for further proceedings consistent with this opinion. RAP 13.7(b).
ALEXANDER, C.J., SMITH, MADSEN, and IRELAND, JJ., concur.
OWENS, J. (dissenting).
In reversing the Court of Appeals and reinstating the trial court's grant of summary judgment in this case, the majority has failed to view the facts in the light most favorable *124 to the nonmoving party (Lu and Sun), has erringly concluded that the transfer of a long-term proprietary lease is not within the real estate statute of frauds, and has ignored the alternative arguments that Lu and Sun raised for affirming the reversal of summary judgment.
In December 1996, Barbara Palecek and Donald Firth began discussing with neighbor Hefu Lu the possibility of purchasing the apartment that Lu and his wife, Qian Sun, owned and occupied. An initial sale price of $165,000 was suggested, but Lu left the country on business, leaving John Swaner, Lu's business partner and likewise a resident of the Maryland Apartments, to serve as intermediary. Although the majority reports that Swaner "drew up" the agreement, majority at 118, Palecek's September 1998 declaration states that she and Firth drew up the agreement: "In response to our inquiries about price, Mr. Swaner gave us the figure of $180,000.... [W]e desired to reduce this agreement to writing.... We understood that Mr. Swaner was going to meet Mr. Lu in Europe. Therefore, we drew up a purchase and sale agreement that provided for the sale of the Lu and Sun interest in the Maryland Apts. for the sum of $180,000 with a date for the taking of possession on October 15, 1997." Clerk's Papers (CP) at 26 (emphasis added); see also Palecek's July 1999 Declaration, CP at 107 (inserting "with Mr. Swaner" before "we drew up"). The six-line writing, which Swaner said he "believe[d]" he had typed up, CP at 186, states that Firth and Palecek "agree to purchase Apartment 2 (626 13th Avenue East) from... Lu and ... Sun for $180,000," with "[p]ossession to take place on October 15, 1997." CP at 4 (emphasis added). The writing also noted that Firth and Palecek had provided $500 in earnest money.
Firth and Palecek signed the agreement on April 18, 1997, the date of the agreement itself. Although Lu's and Sun's signatures are dated April 23, 1997, Palecek's declaration raises some questions about when Sun signed:
We understand that Mr. Swaner presented the Agreement to Mr. Lu for his signature when they met in Europe and that ... [u]pon returning to the United States ... Mr. Swaner presented the agreement for signature to Qian Sun, .... Mr. Swaner indicated to us that there was some reluctance on the part of Ms. Sun. He suggested that that reluctance might be overcome by making another deposit payment. Therefore, in June we increased the deposit by $1500. Shortly thereafter, we received back through Mr. Swaner the purchase agreement signed by both Hefu Lu and Qian Sun.
CP at 107 (emphasis added); see also CP at 26 (using "may be" instead of "might be"). Thus, the record shows that Palecek and Firth were aware of Sun's reluctance to sign the agreement and that they wrote additional earnest money checks on June 6, 1997, thinking that the increase "might" persuade Sun to sign; why Sun's signature was ultimately dated April 23, 1997, is unclear. The original agreement was not amended to reflect the increased earnest money, nor was that change memorialized in any other writing.
Similarly, the parties twice changed the original closing date of October 15, 1997. In early October 1997, Lu asked Firth to delay taking possession until November 15 because the apartment that he and Sun were moving into was not going to be ready by the closing date. Firth and Palecek agreed, and when Lu later requested an additional month's extension, Firth and Palecek changed the date of possession to the end of December, since the prospect of moving prior to the holidays was unappealing. Just as the agreement was not amended to reflect the additional earnest money, the parties did not put in writing either of the two changes in the closing date.
At no time in 1997 did Firth and Palecek tender the purchase price or even demonstrate a readiness to close on the purchase of their neighbors' apartment. To close, Firth and Palecek needed to sell their own apartment, not only because they needed the money, but because the bylaws of the Maryland Apartments prohibited individuals from owning more than one unit. Yet Firth and Palecek, electing not to contract with a real estate agent, made only the sketchiest attempts to market their ground-floor apartment. As of mid-November, they had done nothing *125 more than display a "for sale" sign in their window, kept there for six weeks at most. After Christmas, they advertised their one-bedroom apartment on an Internet site, asking $210,000$30,000 more than they were still hoping to pay for Lu and Sun's more desirable two-bedroom apartment. By the end of December 1997, when the last closing date arrived, Firth and Palecek had not set up an escrow for closing and had neither sold their apartment nor applied for a loan to finance the purchase. Although Palecek claimed that they had an offer of backup financing from relatives, the record shows that by the end of 1997 Firth and Palecek had not reached any agreement for a loan covering the full purchase price.
In January 1998, Lu told Firth and Palecek that Sun had not been satisfied with the sale price and that an acceptable price would be $230,000. The record shows that Lu had been aware since September 1997 that Sun did not want to sell the apartment for $180,000. The record includes the following excerpt from Lu's deposition testimony:
Q. [Plaintiffs' counsel] Now, the sale for Apartment 2 was not concluded in October 1997, correct?
A. [Lu]Yes.
Q. And why is that?
A. First of all, I came back to Seattle in September and I tell my wife we may have to sell our apartment. She said well, how much. And I said $180,000. She said no, ....
CP at 262. Similarly, according to Sun, in October 1997, after Lu had returned to the United States and "indicated [to her] that he had signed a document agreeing to a price of $180,000," she told him that she was "not in agreement with $180,000 but ... would be willing to sell it for $230,000." CP at 171. This evidence certainly casts further doubt on the timing and meaningfulness of Sun's April 23, 1997, signature on the agreement. Moreover, Lu also appears to suggest in his deposition that Sun's lack of fluency in English led him to make the initial decision for both of them: "The reason I do this because I think she doesn't understand English, so I just make every decision myself. Right? But turn out it doesn't work that way. She still want to share the decision, you know." CP at 264.
Palecek asserted in her declaration that Sun's desire to sell the two-bedroom apartment for $230,000 had been "a great disappointment," since "[n]ot only was the increased price not what we had agreed to, but in our opinion it was not consistent with the value of comparable units in the apartment building"an opinion at odds with Firth and Palecek's advertisement of their own one-bedroom unit in December 1997 for $210,000. CP at 27, 108 (emphasis added). Palecek explained that she and Firth "sought the advice of an attorney at a neighborhood legal clinic to determine whether we had a legally binding agreement." CP at 27, 108. They wrote a letter to Lu and Sun on February 7, 1998, asserting their position that they had "entered into a valid contract to buy Apartment 2 at 626 13th Avenue East for $180,000.00" and that, if Lu and Sun "fail[ed] to honor the contract by March 1," Firth and Palecek would "consider all of [their] legal options to enforce the contract." CP at 69 (emphasis added). Four days later, on February 11, 1998, Palecek applied for financing for the first time, four months after the original closing date and six weeks after the expiration of the last orally agreed upon closing date. However, according to Swaner, at a co-op meeting on February 24, 1998, Firth told him that "they were not going to continue" and asked him to return the uncashed deposit checks. CP at 236.
On May 22, 1998, Firth and Palecek filed suit, alleging breach of contract and seeking an order of specific performance requiring Lu and Sun "to transfer [to Firth and Palecek] the block of shares and right of proprietary lease associated with Apartment 2." CP at 3 (emphasis added). Lu and Sun, who had purchased their apartment in 1994 by executing a standard form Residential Real Estate Purchase and Sale Agreement, denied that the brief, typewritten agreement of April 18, 1997, had been intended as their final, definitive agreement for the sale of their apartment to Firth and Palecek. In their answer to the complaint, as well as in a CR 12(b)(6) motion, Lu and Sun asserted that Firth and Palecek's claim was barred because *126 it failed to satisfy the statute of frauds and because the writing did not contain sufficient terms to allow a court to enter a decree of specific performance.
The trial court denied Lu's CR 12(b)(6) motion in October 1998 and granted Firth's motion for summary judgment in August 1999. On November 6, 2000, the Court of Appeals reversed the trial court and granted Lu's motion to dismiss. See Firth v. Lu, 103 Wash.App. 267, 278-79, 12 P.3d 618 (2000).
I agree with the conclusion of the Court of Appeals that the sale of a cooperative apartment constitutes the transfer of an interest in real property and thus falls within the real estate statute of frauds. The statute of frauds protects against the "uncertainty inherent in oral contractual undertakings." Miller v. McCamish, 78 Wash.2d 821, 829, 479 P.2d 919 (1971). The real estate statute of frauds is intended to bring uniformity and clarity to the form and content of purchase and sale agreements. See Key Design, Inc. v. Moser, 138 Wash.2d 875, 983 P.2d 653, 993 P.2d 900 (1999). Because no Washington cases had considered whether the sale of a cooperative unit implicated the real estate statute of frauds, the Court of Appeals reasonably relied on precedent from New York and New Jersey, states in which cooperatives are much more prevalent than in Washington. The most influential case, Presten v. Sailer, 225 N.J.Super. 178, 542 A.2d 7 (1988), drew on New York cases and concluded that, although the conveyancing of a cooperative apartment involved both the transfer of a stock certificate and the granting of a proprietary lease, the fundamental aim of the process was to create property rights.
The Presten approach is sound. It acknowledges the reality that the sale is a "hybrid" transaction, id. at 13, that the stock certificate and the proprietary lease are "interdependent." 4 Thompson on Real Property § 36.04(b) (David A. Thomas ed., 1994). When the two components are weighed, it is the proprietary lease, not the stock certificate, that is closer to the essence of the transaction: the prospective purchasers want the proprietary lease, the right of occupancy. That is why Firth and Palecek drew up an agreement "to purchase Apartment 2" and later wrote a letter seeking enforcement of their agreement "to buy Apartment 2." CP at 4, 69.
In sum, the essence of the sale of a cooperative unit is the sale and purchase of a long-term leasehold interest in real property, and "[t]here is no dispute that an agreement to lease for more than 1 year is within the statute of frauds." Family Med. Bldg., Inc. v. Dep't of Soc. & Health Servs., 104 Wash.2d 105, 108, 702 P.2d 459 (1985) (citing RCW 19.36.010, 64.04.010). The only reasonable alternative to considering the essence of the transaction would be to ignore the interdependence of stock and lease and treat them as two separate interests to be sold; such an analysis would yield the same result because the lease, treated separately, would itself fall under the statute of frauds.
The majority takes neither approach, choosing instead to define the sale of a cooperative apartment by looking exclusively at the first formality of the stock certificate and thinking no further. In taking this approach, the majority ignores the caveat that "[e]verything should be made as simple as possible, but not simpler."[1] Here, the depth and breadth of the majority's analysis is that stock is stock. But cooperative stock is not very stock-like, after all,[2] and the stock certificate has no vitality in the transaction apart from the proprietary lease.[3]
*127 The majority also appears to embrace the argument, which Firth and Palecek failed to raise below,[4] that the agreement to transfer an interest in a cooperative should not be regarded as a writing conveying a property interest since "[a]ll that it creates is the right of the purchaser to request of a cooperative board of directors the issuance of stock and a proprietary lease, which ultimately lies in the discretion of the board of directors to provide." Pet. for Review at 12. As the bylaws of cooperatives generally require, the bylaws of the Maryland Apartments make transfer contingent on approval by the board of directors. The majority mistakenly regards the contingency of board approval as the substance of the parties' negotiations; by such reasoning, the inclusion in a real estate purchase and sale agreement of a contingency for financing approval from a third party would mean that the agreement was not a contract for the sale of realty. Here, the agreement between the parties was not an agreement to satisfy the contingency of board approval, but an agreement to convey a long-term proprietary lease.
The writing at the heart of this dispute does not satisfy the statute of frauds. Plainly, the property description at issue here "Apartment 2 (626 13th Avenue East)" lacks the elements specified in Martin v. Seigel, 35 Wash.2d 223, 229, 212 P.2d 107 (1949), and reaffirmed in Key Design, 138 Wash.2d at 881-84, 983 P.2d 653. Nor do Firth and Palecek seek a change in the long-standing Washington rule; instead, they seek the anomalous holding that, because only the apartment building and not the cooperative unit has an independent legal description, an agreement conveying such a property interest need not even identify the city, county, and state in which the building is located. Prior decisions weigh heavily against such a holding. See, e.g., Broadway Hosp. & Sanitarium v. Decker, 47 Wash. 586, 590, 92 P. 445 (1907) (holding that street address lacking city, county, and state failed to satisfy statute of frauds); Bonded Adjustment Co. v. Edmunds, 28 Wash.2d 110, 111-12,182 P.2d 17 (1947) (holding description "a house at 2626 W Fairview" inadequate under statute of frauds); Martin, 35 Wash.2d at 228, 212 P.2d 107 (holding description of property "not merely by street number, but also by city, county and state" defective under statute of frauds).
Even if the agreement had not run afoul of the statute of frauds, the reversal of the trial court's grant of summary judgment should be affirmed on the alternative grounds that Lu and Sun presented to the Court of Appeals and renewed in their answer to Firth and Palecek's petition to this court. Most persuasive of the additional arguments is Lu and Sun's contention that material issues of fact remained concerning Firth and Palecek's ability to perform.[5] Moreover, as Lu and Sun also maintain, the failure of the parties to perform prior to any of the three closing dates should have resulted in the expiration of the original agreement. See Mid-Town Ltd. P'ship v. Preston, 69 Wash.App. 227, 235, 848 P.2d 1268, review denied, 122 Wash.2d 1006, 859 P.2d 603 (1993) ("both parties could have walked away from the agreement because, by its own terms, the *128 agreement had expired" when the last written extension date for closing passed).
I would affirm the decision of the Court of Appeals, but at the very least, under RAP 13.7(b), the majority must remand the case to the Court of Appeals for consideration of Lu and Sun's additional arguments.
JOHNSON and CHAMBERS, JJ., concur.
NOTES
[1] Nonshareholders may reside at the Maryland Apartments by virtue of the right of shareholder-tenants to sublet their units. The ability to sublet is subject to certain restrictions, and is of no concern to our resolution of this case.
[2] The deposit of the purchase money was carried out pursuant to a stipulated arrangement between the parties, based on which the trial court entered an order directing the Lus to place the sale proceeds in the blocked trust account.
[3] "If the Supreme Court reverses a decision of the Court of Appeals that did not consider all of the issues raised which might support that decision, the Supreme Court will either consider and decide those issues or remand the case to the Court of Appeals to decide those issues." RAP 13.7(b).
[4] Contrary to the dissent's characterization, we do not conclude transfers of long-term proprietary leases are outside the real estate statute of frauds. See dissent at 124. Whether such transfers are within RCW 64.04.010 is not an issue here. Cf. dissent at 126 (noting transfer of long-term leases falls under the real estate statute of frauds). As a matter of law, the transfer between the Lus and Firths was not, and could not be, one to transfer a long-term lease since the Lus had no ability to transfer their lease to anyone other than Maryland Apartments, Inc.
[5] Since we hold a transfer of stock in a cooperative-housing corporation is not a transfer of an interest in real property and therefore does not fall within RCW 64.04.010, we do not reach the issue of whether the agreement in question was unenforceable for want of a proper legal description. See dissent at 127; Firth, 103 Wash.App. at 275, 12 P.3d 618. For the same reason, we find unpersuasive the Lus' alternative argument the agreement is unenforceable because it lacks essential material terms insofar as the terms to which the Lus refer are uniquely required to create an enforceable agreement to transfer real property or an interest therein. See Hedges v. Hurd, 47 Wash.2d 683, 687, 289 P.2d 706 (1955); Kruse v. Hemp, 121 Wash.2d 715, 722, 853 P.2d 1373 (1993).
[1] This quotation has been attributed to Einstein. See ALICE CALAPRICE, THE EXPANDED QUOTABLE EINSTEIN 314 (2000).
[2] Shares of cooperative stock "lack the requisite common features of stock in the financial markets." Presten, 542 A.2d at 11 (citing United Hous. Found., Inc. v. Forman, 421 U.S. 837, 851, 95 S.Ct. 2051, 44 L.Ed.2d 621, reh'g denied, 423 U.S. 884, 96 S.Ct. 157, 46 L.Ed.2d 115 (1975)).
[3] The majority mistakenly relies on Bell v. Hegewald, 95 Wash.2d 686, 692, 628 P.2d 1305 (1981), which concerned the sale of stock in a corporation whose sole asset was real estate. The Court of Appeals distinguished Bell by observing that "it is the nature of the rights the purchaser receives, not the classification of the corporation's assets, that determines whether the shares purchased represent an interest in real property." Firth, 103 Wash.App. at 274, 12 P.3d 618. Plainly, the purchaser of cooperative shares, unlike the purchaser of shares in a corporation with real estate assets, gains a proprietary lease, a right of exclusive occupancy.
[4] "This court does not generally consider issues raised for the first time in a petition for review." Fisher v. Allstate Ins. Co., 136 Wash.2d 240, 252, 961 P.2d 350 (1998).
[5] See Willener v. Sweeting, 107 Wash.2d 388, 396, 730 P.2d 45 (1986) (affirming dismissal of purchasers' action under earnest money agreement where "testimony throughout the record question[ed] plaintiffs' ability to provide the necessary funds to close the deal with defendants"). Lu and Sun's challenge to Firth and Palecek's ability to perform has not been mooted by Palecek and Firth's subsequent compliance with the trial court's order of specific performance. The parties agreed that Lu and Sun's voluntary compliance with that equitable order would not constitute a waiver of their right to appeal the order. The focus on appeal is whether an issue of fact remained as to Palecek and Firth's ability to perform on the closing date in 1997. RAP 12.8 provides that, "[i]f a party has voluntarily or involuntarily partially or wholly satisfied a trial court decision which is modified by the appellate court, the trial court shall enter orders and authorize the issuance of process appropriate to restore to the party any property taken from that party, the value of the property, or in appropriate circumstances, provide restitution."